1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

8
9
10

APOLLO, INC, a Washington
corporation; and APOLLO SHEET
METAL, INC., a Washington
corporation,

NO.  CV-03-5095-RHW

11

Plaintiffs,

12

v.

13
14

PARSONS INFRASTRUCTURE &
TECHNOLOGY GROUP, INC, a
Nevada corporation,

15

Defendant.

**ORDER DENYING, IN PART,
AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR
SUMMARY JUDGMENT**

16

17      Before the Court are Defendant's Motion for Summary Judgment Regarding

18  Damages and Causation (Ct. Rec. 136); Defendant's Motion for Summary

19  Judgment Regarding Breach of Contract (Ct. Rec. 138); Defendant's Motion for

20  Summary Judgment Regarding Tortious Interference with Business Expectancies

21  (Ct. Rec. 140); Defendant's Motion for Summary Judgment Regarding Fraud (Ct.

22  Rec. 142); and Defendant's Motion for Summary Judgment Regarding

23  Misappropriation of Trade Secrets (Ct. Rec. 144).  A hearing was held on the

24  motions on June 3, 2005, in Spokane, Washington.  Plaintiffs were represented by

25  John Stewart and Thomas Larkin; the Government was represented by Robert

26  Olson and David Schiffren.

27  ///

28  ///

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 1**

**BACKGROUND**

Fluor Hanford is a government contractor hired by the United States Department of Energy, which is in charge of the cleanup and ultimate closure of the Hanford Nuclear Reservation located in Richland, Washington. On May 22, 2003, Fluor and its subcontractor, CH2M Hill Hanford, issued a Request for Proposals ("RFP") regarding fabrication services. On June 4, 2003, representatives from Plaintiffs and Defendant attended a pre-proposal conference held in Richland, Washington.

The RFP gave favorable treatment to proposals submitted with small business participation. Defendant was a large corporation, with corporate offices in Pasadena, California, and Plaintiffs were a small local business. After holding discussions with four local small businesses, Defendant decided to work with Plaintiffs to submit a joint proposal.

Bruce Ratchford, of Apollo, and Jim Osterloh and Steve Gorin, of Parsons, met on June 10, 2003. According to Plaintiffs, Defendant informed them that Defendant was interested in submitting a joint proposal with Plaintiffs because of Plaintiffs' prior experience with fabrication contracts at the Hanford facility, Plaintiffs' general experience with fabrication, and because Plaintiffs were a small business. Plaintiffs assert that they specifically informed Defendant of the details of their safety record at the June 10, 2003 meeting. Mr. Gorin prepared the Draft Teaming Agreement for Plaintiffs' review after the June 10, 2003 meeting. On June 16, 2003, Mr. Ratchford and Mr. Osterloh met to discuss the Draft Teaming Agreement. At some point, Mr. Ratchford, in the presence of Plaintiffs' employees Brett Estey, Dan Briscoe, and Mr. Osterloh, stated that Mr. Estey and Mr. Briscoe should go forward in preparing the joint proposal because "we have an agreement." Later that day, a kick-off meeting was held in which personnel from both companies discussed proposal preparation responsibilities. In an Interoffice Correspondence written by Mike Pell, of Parsons, to Karl Burchett on June 17,

**ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 2**

2003, Mr. Pell writes that "an exclusive agreement has been made between Parsons and the Apollo Group."

Personnel from both companies continued to meet on June 18, 20, 25, 26, 29, and 30, 2003.  During these meetings, the parties discussed specifics of proposal preparation, including Plaintiffs' proposal strategy, pricing, cost structure, proposed work processes, Plaintiffs' safety program, Plaintiffs' quality assurance program, specific examples of forms, lists of vendors and clients, descriptions of Plaintiffs' internal accounting and estimating systems, and internal capabilities and weaknesses strategy reports.  Plaintiffs also provide information regarding the sample task portion of the RFP.

On July 1, 2003, Defendant notified Plaintiffs that it had decided not to team with Plaintiffs on the Hanford Fabrication Services procurement.  Defendant asserts that in reviewing Plaintiffs' copy of its Safety Manual for inclusion into the proposal, which it had received on July 27, 2003, it realized that Plaintiffs' safety record violated the minimum standards set forth in the RFP, and concluded that a joint proposal with Plaintiffs would not be successful.  Plaintiffs assert Defendant had been aware of any safety issues since the June 10, 2003 meeting.

Prior to the July 1, 2003 notification, representatives from Plaintiffs and Defendant had met to try to work out a solution regarding Plaintiffs' safety record.  Defendant asserts that a possible solution was discussed in which Defendant would become the prime contractor, and Plaintiffs would be the subcontractor.  According to Defendant, Plaintiffs rejected this offer.  According to Plaintiffs, Mr. Ratchford agreed with Defendant's suggestion that Defendant would act as prime contractor and Plaintiffs would be a subcontractor.  In any event, discussions broke down and the parties proceeded to submit individual proposals to the RFP.

Defendant submitted a proposal to the RFP, with Defendant as prime contractor, and American Electric & Northwest Inspection as subcontractrors.  Plaintiffs also submitted a proposal to the RFP, with Plaintiffs as prime contractor,

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 3**

and Mid Columbia Engineering ("MCE") and COCEMA Engineering as subcontractors.  Ultimately, Defendant was awarded the bid.

On August 18, 2003, Plaintiffs filed a complaint in Benton County Superior Court seeking injunctive and declaratory relief, as well as monetary damages.  The named Defendants were Parsons Infrastructure & Technology Group, Inc., Fluor Hanford, Inc., and CH2M Hill Group, Inc.  The case was removed to the United States District Court for the Eastern District of Washington on September 11, 2003.  On June 9, 2004, Plaintiffs filed a Second Amended Complaint seeking injunctive and declaratory relief, and damages for breach of contract, fraud, interference with prospective economic advantage, and misappropriation of trade secrets, and also adding the United States as a Defendant  (Ct. Rec. 76).  On November 11, 2004, the Court granted the United States' Motion to Dismiss, as well as Defendants Fluor Hanford, Inc. and CH2M Hill Group, Inc.'s Motion for Judgment on the Pleadings (Ct. Rec. 112).  Defendant Parsons now moves for summary judgment on all of Plaintiffs' remaining state claims.

JURISDICTION

The Court has jurisdiction to hear this case based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

DISCUSSION

## I.  Standard of Review

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in that party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 4**

on which the party will bear the burden of proof at trial," then the trial court should grant the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## II. Defendant's Motions

Defendant has filed a number of summary judgment motions regarding Plaintiffs' remaining state claims.

### A.  Defendant's Motion for Summary Judgment Regarding Damages and Causation

Defendant argues that there are no genuine issues of material fact regarding whether Plaintiffs would have received the contract, but for Defendant's actions. As a result, summary judgment is appropriate for all of Plaintiffs' claims because Plaintiffs cannot show that Defendant caused their alleged damages.

Plaintiffs argue that, but for Defendant's conduct, it would have been awarded the contract either: (1) on it own, had preparation of its bid not been interfered with by Defendant; (2) with Plaintiffs as the prime contractor, and Defendant as a subcontractor; (3) with Defendant as the prime contractor, and Plaintiffs as a subcontractor; or (4) with some other team member or members, as either a prime or significant subcontractor.

Plaintiffs' arguments, for the most part, are without merit. Assuming that the Teaming Agreement is a legally enforceable agreement, the terms of the agreement did not anticipate that Defendant would become the prime contractor with Plaintiffs as a subcontractor. Thus, Plaintiffs do not have a legal basis for assuming that they could have obtained the contract under this arrangement because Defendant was not legally obligated to act as a prime contractor. Additionally, Plaintiffs did not submit any evidence that they would have entered

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 5**

1  into any other agreement with another company, but for the exclusive nature of the

2  teaming agreement.  Plaintiffs assert that they could have, theoretically, teamed

3  with the second place bidder, RHM.  Plaintiffs did not provide any evidence that

4  RHM would have been interested in working with Plaintiffs in obtaining the bid.

5  Thus, the Court finds that there are no genuine issues of material facts regarding

6  whether Plaintiffs would have received the bid, but for Defendant's conduct with

7  Plaintiffs' third argument that they could have received the bid with Defendant as

8  prime, or with their fourth argument that they could have teamed with RHM, or

9  any other company.

10      Plaintiffs argue that they could have received the bid on their own if they

11  had more time to prepare and if Defendant had not submitted a bid.  In order to

12  succeed in this argument, Plaintiffs must show that they would have been selected

13  over the second-place bidder.  In reviewing the evidence provided by the parties,

14  the Court concludes that a trier of fact could reach only one conclusion, namely,

15  that Plaintiffs would not receive the bid as prime, without Defendant as the

16  subcontractor.  *See City Solutions, Inc. v. Clear Channel Communications, Inc.*,

17  365 F.3d 835, 841 (9th Cir. 2004) (holding that a question of fact may be

18  determined as a matter of law when reasonable minds can reach only one

19  conclusion); *Miller v. Likins*, 109 Wash. App. 140, 144 (2001).

20      A review of the Source Evaluation Board Award Recommendation Report

21  for Request for Proposal (RFP) 050103-DLS shows that RHM had the same or

22  superior rating as Plaintiffs in all categories.  (Ct. Rec. 152, at p. 81.)  Importantly,

23  RHM received a yellow rating in the Safety Program category and Plaintiffs

24  //

25  //

26  //

27  //

28  //

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 6**

1  received an amber rating.[1]  (Ct. Rec. 152, at pp. 80, 81.)  In a September 11, 2003

2  letter to Plaintiffs from the TET, the TET identified potential safety issues that

3  were apparent from the site visit.  (Ct. Rec. 153, at p. 55.)  The letter says nothing

4  about the prior safety record.  Indeed, the Award Recommendation Report, which

5  set forth TET's rating for each contractor competing for the bid, stated that "the

6  safety statistics provided by Apollo meet the RFP criteria, despite an overall safety

7  record that is less than optimal."  (Ct. Rec. 152, at p. 73.)  The report went on to

8  say that "Apollo has been effective in implementing the corrective actions, leading

9  to a noticeable improvement in its safety statistics for the past two years.  The

10  safety plan submitted by Apollo was also deemed acceptable, meeting the criteria

11  and expected quality levels."  (Ct. Rec. 152, at p. 74.)

12      Despite this, and contrary to Plaintiffs' representations, safety remained a

13  concern for TET.  During the field visit, members of the TET observed three

14  separate safety violations.  (*Id.*)  The TET members were concerned about

15  Plaintiffs' immediate verbal response at the time of the occurrence, as well as

16  having three safety violations occur even though Plaintiffs knew the observers

17  were coming.  (*Id.*)  The TET concluded that Plaintiffs' current level of field

18  execution of their safety plan submitted was less than adequate and posed

19  _____

20  [1]The following definitions apply to the Color Code referred to in the

21  Technical Evaluation Team ( TET) Recommendation Report:

| Color Code | Rating | Definition |
|------------|--------|------------|
| Green | Good | Fully satisfies criteria and expected standards; strengths outweigh weaknesses. |
| Yellow | Acceptable | Meets criteria and expected standards; no major strengths or weaknesses and apparent |
| Amber | Poor | Does not appear to meet criteria and expected standards; major weaknesses are apparent, but could possibly be rectified. |

28  (Ct. Rec. 152 at p. 70.)

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 7**

1  substantial risk when managing HAMTC (union) workers. (*Id.*) As a result of

2  their observations, the TET was concerned that Plaintiffs' "sheet metal shop and

3  their subcontractors did not demonstrate that what is submitted in their safety plans

4  is followed in the field," and stated that "there is serious concern with respect to

5  how Apollo and their subcontractors will ensure their safety plan and procedures

6  are executed." (*Id.*) Plaintiffs' amber score, then, was not caused in any way by

7  Defendant's conduct. Instead, the amber score was a result of the condition of

8  Plaintiffs' facility and Plaintiffs' overall approach to safety.

9      Plaintiffs also received an amber rating in Management and Technical

10  Approach. (*Id.* at 72.) Plaintiffs received this lower rating, in part, because of their

11  teaming relationship with MCE. (*Id.*) It appears that Fluor may have a prior

12  experience with MCE that was less than favorable. (*Id.*) The TET concluded that,

13  "[b]ased on the references and the presentation of the engineering organization, [it]

14  felt that this element was below the expected standards for engineering support,

15  and poses risks in this area." (*Id.*) The TET also noted that the integration

16  between Plaintiffs and their teaming partners appeared to be weak. (*Id.*) Plaintiffs

17  teamed with MCE only after Defendant pulled out of the Apollo/Parsons project.

18  Viewing the facts in the light most favorable to Plaintiffs, the lack of integration

19  and coordination could be attributed to Defendant's late-hour decision to pull out

20  of the project. Thus, it could be argued that Plaintiffs could have received a green

21  rating in this category, but for Defendant's conduct. Even if this were the case,

22  however, Plaintiffs still would not have won the bid over RHM. The TET was also

23  concerned about Plaintiffs' key personnel and the ability to successfully manage

24  the project. The TET discussed their concerns with Plaintiffs, but it appears that

25  Plaintiffs were committed to having Mr. Estey run the project. The decision to

26  keep Mr. Estey as project manager was not a result of Defendant's decision to not

27  submit a joint proposal with Plaintiffs. Thus, the argument that Plaintiffs would

28  have received a green rating in Management and Technical Approach is not

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 8**

1   supported.

2       Regardless of whether Plaintiffs received a green or yellow in the

3   Management and Technical Approach, however, Plaintiffs would not have been

4   awarded the contract because RHM still would have received a higher score.

5   Plaintiffs' score for past performance was not affected by Defendant's conduct and

6   would not change, regardless of the company with which Plaintiff would ultimately

7   team.  Likewise, there is no evidence presented that Defendant hampered

8   Plaintiffs' transition score.

9       Below is a comparison of the ratings received by Plaintiffs and RHM, giving

10  Plaintiffs a hypothetical Green rating in Management and Technical Approach.

11  For ease of comparison, the Court awarded points for each rating: green, 3 points;

12  yellow, 2 points, and amber, 1 point.

| Evaluation Criteria | Apollo Adj. Rating | | RHM Adj. Rating | |
|---|---|---|---|---|
| Management and Technical Approach | Green | 3 | Yellow | 2 |
| Transition Plan | Yellow | 2 | Yellow | 2 |
| Past Performance | Yellow | 2 | Green | 3 |
| Safety Program | Amber | 1 | Yellow | 2 |
| Business Development Plan | Green | 3 | Green | 3 |
| Overall Rating | | 11 | | 12 |

21      Viewing the evidence in the light most favorable to the Plaintiffs, the Court

22  concludes that there is only one reasonable conclusion based on the facts in the

23  record, that is, that Plaintiffs would not have received a bid as prime contractor,

24  without Defendant as subcontractor.  According to the reasoning and conclusions

25  of the evaluation committee as set forth in the TET Recommendation Report,

26  Plaintiffs' score in the Safety Program category would have prevented Plaintiffs

27  from receiving a higher score than RHM; therefore, they cannot show that they

28

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 9**

1    would have received the bid as a prime contractor, acting alone.

2          Also, Plaintiffs' argument that they could have submitted a better proposal if

3    they had more time is without merit, since it is clear from the record that Plaintiffs

4    had ample time and opportunity to supplement the record.  After receiving the

5    proposals, the TET, which had reviewed the proposals, decided it was necessary

6    for the parties to submit a Best and Final Offer.  The TET prepared a list of

7    questions and clarifications needed from each of the parties who submitted

8    Proposals.  Meetings were held with the TET, and each party was given an

9    opportunity to submit their clarification response with their best and final offer.

10   Plaintiffs received a letter dated September 15, 2003, outlining the TET's concerns

11   and were allowed until October 10, 2003 to file their Best and Final Offer.  (Ct.

12   Rec. 153 at 55.)  Thus, Plaintiffs were given a significant amount of time to submit

13   a proposal on their own, so it does not appear that Plaintiffs can complain about the

14   lack of time to adequately compete for the Proposal, because they were given an

15   additional month in which to respond to the TET's concerns.

16         Moreover, the TET was concerned about Plaintiffs' pricing structure, and

17   expressed this concern during the Best and Final Offer period.  (Ct. Rec. 153 at

18   83.)  Plaintiffs' pricing was almost a third less when comparing the costs of the

19   other bidders.  (*Id.*)  The TET discussed its concern regarding the pricing structure,

20   and, according to the Evaluation Report, subsequent discussions with Plaintiffs

21   failed to eliminate its concern.  (*Id.*)   The TET ultimately concluded that "the cost

22   evaluation left apprehension that not all costs [were] included in [Plaintiffs']

23   evaluated price."  (*Id.*)  The failure to alleviate the TET's concern regarding pricing

24   was not affected by Defendant's actions.  (*Id.*)

25         Plaintiffs also argue that they suffered damage because but for Defendant's

26   departure, the Apollo/Parsons joint proposal would have received the contract.

27   In support of their summary judgment motion, Defendant relies on the declaration

28   of Daniel Sutter, Contract Specialist for Fluor Hanford, Inc., who was part of the

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 10**

evaluation team, who concluded that Plaintiffs would not have been successful in obtaining an award, even if Defendant continued in the project as a subcontractor. (Ct. Rec. 150 at p. 19.)  Plaintiffs have established that there are genuine issues of material fact regarding the credibility of Mr. Suter, although the Court acknowledges that the evidence is weak.  Unless the Court can conclude that reasonable minds can come to only one conclusion based on the facts, summary judgment is not appropriate with regard to causation.  *City Solutions, Inc.,* 365 F.3d at 841; *Miller,* 109 Wash. App. at 144.  Given the fact that Mr. Suter is an employee of Fluor, which was, at one time, a named party in this lawsuit, the Court cannot find that there is no scenario in which the trier of fact could have reasonably concluded that a joint Apollo/Parson proposal would not have won the bid. Moreover, Defendant's experts have acknowledged that if Plaintiffs are successful in their claim, the amount of damages can be proven with "reasonable certainty." *See Eagle Group, Inc. v. Pullen*, 114 Wash. App. 409, 418 (2002) (holding that a plaintiff may recover lost profits if the evidence establishes the damages with reasonable certainty).

Viewing the facts in the light most favorable to Plaintiffs, the only genuine issue of fact that remains with regard to causation and damages is whether Plaintiffs were damaged by the Defendant's failure to submit a joint proposal with Plaintiffs as prime contractor, and Defendant as a subcontractor.  Plaintiffs have failed to establish a genuine issue of material fact regarding their claims that they were damaged because Defendant submitted a proposal on its own and won, because Defendant did not submit a joint proposal as prime contractor with Plaintiffs as subcontractor, or because they could have submitted a successful proposal with another company.  Thus, summary judgment regarding these causation issues is appropriate.  The only remaining causation issue for trial, then, is whether Plaintiff was damaged by Defendant's failure to submit a joint proposal with Plaintiff.

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** ~ 11

In so ruling, the Court is mindful of the Ninth Circuit case of *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 365 F.3d 835 (9th Cir. 2004), in which the circuit recognized that under California law, facts relating to the issue of causation is a job properly left to the trier of fact and should not be the basis for the granting of a summary judgment motion.  *Id.* at 840.  The facts in *City Solutions* are strikingly similar to this case.  In *City Solutions*, the plaintiff alleged there was an oral teaming agreement and defendant pulled out of a joint bid proposal at a late hour.  *Id.* at 837.  The district court relied on the plaintiff's testimony that it was not hurt by having to bid with the two companies that replaced the defendant in holding that there was no scenario by which a jury could reasonably conclude that the plaintiff could have won the bid, either alone or in combination with anyone other than defendant.  *Id.* at 841.  The circuit held that the district court erred in granting judgment as a matter of law by failing to account for the possibility that a jury could have found that the plaintiff was hurt by the defendant's improved proposal attributable to its misuse of the plaintiff's confidential bidding strategies.  *Id.*

The *City Solutions* case is distinguishable from this case  because, as discussed above, Plaintiffs cannot argue that they were hurt by Defendant's improved position as a result of its use of Plaintiffs' confidential information because Plaintiffs cannot show that they would have received the bid if Defendant had not bid.  Likewise, there is no evidence in the record that it was possible for Plaintiffs to improve their position by teaming with some other company, or that Defendant was legally obligated to submit a joint proposal with Defendant as prime contractor and Plaintiff as subcontractor.  In contrast to *City Solutions*, *Inc.*, then, there is no scenario by which a jury could have reasonable concluded that Plaintiffs would have received the bid if Defendant had not bid as prime contractor.

//

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** ~ 12

1
2

**B.    Defendant's Motion for Summary Judgment Regarding Breach of Contract**

3    Defendant argues that there are no genuine issues of material fact regarding
4 whether there was a legal enforceable contract between Plaintiffs and Defendant.

5    Washington law recognizes a distinction between an "agreement" and a
6 "contract."  An agreement is "a manifestation of mutual assent by two or more
7 persons to one another."  *Corbit v. J.I. Case Co.*, 70 Wash. 2d 522, 531 (1967).  A
8 contract is "a promise or a set of promises for the breach of which the law gives a
9 remedy, or the performance of which the law in some way recognizes as a duty."
10 *Id.*  Consequently, there are no legal consequences that attach to an agreement.  *Id.*

11    Washington law also follows the objective theory of contracts, which
12 focuses on the outward manifestation of assent made to the other party.  *Lynott v.*
13 *National Union Fire Ins. Co. of Pittsburgh*, 123 Wash. 2d 678, 682 (1994).  Thus,
14 in determining a party's intention to contract, such party will be held to what a
15 reasonable person in the position of the other party would conclude his or her
16 manifestation to mean.  *Id.*  When interpreting a contract, then, the subjective
17 intention of the parties is irrelevant; instead, emphasis is placed on the outward
18 manifestations of assent made by each party to the other.  *Id.*  In order to prove
19 their breach of contract claim, Plaintiffs must show that the contract imposed a
20 duty, Defendant breached that duty, and the breach proximately caused damage to
21 Plaintiff.  *Northwest Indep. Forest Mfrs. v. Department of Labor & Indus.*, 78
22 Wash. App. 707, 712 (1995).

23    It is undisputed that the parties discussed entering into a joint venture in
24 order to bid on the RPF.  It is also undisputed that the parties engaged in
25 preliminary negotiations over the specific terms of their future business
26 relationship, to take effect if their joint proposal was selected by Fluor.  The parties
27 began working together on the proposal in response to the RFP after their second
28 meeting, and they were working on finalizing a written contract to cover their

1  future business relationship.

2      The Court finds that there are genuine issues of material fact as to whether

3  the parties entered into an enforceable contract to submit a bid with Apollo as

4  prime, and whether Defendant breached the contract.

5      **C.    Defendant's Motion for Summary Judgment Regarding Tortious**

6          **Interference with Business Expectancies**

7      Defendant argues that there are no genuine issues of material fact regarding

8  whether Defendant tortiously interfered with Plaintiffs' business expectancies.  In

9  asserting this claim, Plaintiffs argue that they had a reasonable expectancy of

10 obtaining an award of the contract, that they were in a strong position to be

11 awarded the contract and, but for Defendant's actions, they would have received

12 the contract.

13     Under Washington law, in order to establish a claim for tortious interference,

14 Plaintiffs must produce evidence sufficient to support findings (1) of a valid

15 contractual relationship or business expectancy; (2) that Defendant knew of and

16 intentionally interfered with that relationship or expectancy; (3) that the

17 interference induced or caused a breach or termination of that relationship or

18 expectancy; (4) that the interference was for an improper purpose or used improper

19 means; and (5) resultant damage.  *Leingang v. Pierce County Med. Bureau, Inc*.,

20 131 Wash. 2d 133, 157  (1997).  Plaintiffs also must show that Defendant pursued

21 an improper objective of harming the Plaintiffs or used wrongful means that, in

22 fact, caused injury to Plaintiffs' contractual or business relationships.  *Pleas v. City*

23 *of Seattle*, 112 Wash. 2d 794, 803-04 (1989).  The existence of an enforceable

24 contract or the breach of one is not required to support an action for tortious

25 interference with a business relationship.  *Commodore v. University Mech.*

26 *Contractors, Inc.*, 120 Wash. 2d 120, 138 (1992).  Plaintiffs must show that the

27 future opportunities and profits are a reasonable expectation and not based on

28 merely wishful thinking.  *Sea-Pac Co., Inc. v. United Food & Commercial*

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 14**

*Workers Local 44*, 103 Wash. 2d 800, 805 (1985).

In order for Plaintiffs to succeed in their tortious interference claim, at the minimum, Plaintiffs must show that they had a reasonable expectation of receiving the bid. As discussed above, Plaintiffs have not established any genuine issues of material facts regarding whether Plaintiffs had a reasonable expectation to receive the bid, either as a prime contractor without Defendant as a subcontractor, as a prime or subcontractor with some other company, or as a subcontractor with Defendant as prime. Plaintiffs' claim that they would have received the bid if the parties had submitted a joint proposal with Plaintiffs as prime contractor and Defendant as subcontractor is subsumed within the breach of contract and is not a separate claim. As a result, summary judgment with regard to Plaintiffs' tortious interference claim is appropriate.

### D.    Defendant's Motion for Summary Judgment Regarding Fraud

Defendant argues that there are no genuine issues of material fact regarding whether it committed fraud against Plaintiffs. Plaintiffs assert that Defendant fraudulently represented to Plaintiffs that it wanted to "team up" with them and that Defendant never intended to "team up" with Plaintiffs, but only made those representations in order to obtain Plaintiffs' proprietary information.

Under Washington law, in order to prevail on their fraud claim, Plaintiffs must prove the following elements by clear and convincing evidence: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiffs' ignorance of its falsity; (7) plaintiffs' reliance on the truth of the representation; (8) plaintiffs' right to rely upon it; and (9) damages suffered by the plaintiff. *Stiley v. Block*, 130 Wash. 2d 486, 505 (1996).

At the hearing, Plaintiffs referred to Exhibit 49, which the Court dubbed the "we prime" email. Plaintiffs did not refer to this Exhibit in their response to Defendant's motions, other than to list the exhibit in their Statements of Facts.

**ORDER DENYING, IN PART, AND GRANTING, IN PART,
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 15**

1   There was no discussion of the contents of the document.  On the day of the

2   hearing, Plaintiffs presented to the Court a document titled Issues and Evidence

3   Demonstrating Genuinely Disputed Material Facts Precluding Summary Judgment.

4   It does not appear that this particular document was electronically filed.   In that

5   document, Plaintiffs refer to Exhibit 49 as evidence of pretext for Defendant's

6   termination of the oral teaming agreement.  Pursuant to LR 56.1(b), Plaintiffs were

7   required to set forth the specific facts that they maintain establish genuine issues of

8   material fact.  By waiting until the hearing to rely on the email as proof of fraud,

9   Plaintiffs prevented Defendant from replying with evidence surrounding the email,

10  such who was the sender, the responsibilities of this person, and the context in

11  which it was sent.  Accordingly, the Court will not consider the evidence of the

12  email due to Plaintiffs' failure to present it in their responsive pleadings.

13  Additionally, during the Fed. R. Civ. P. 30(b)(6)deposition, Plaintiffs admitted that

14  they could not point to any specific evidence of fraud.[2]

15      Moreover, there is evidence in the record that it was the intention of

16  Defendant's employees, who were based in Richland at the time the parties began

17  working together, to see the project through to completion.  Plaintiffs have not

18  introduced any evidence to rebut this conclusion.  Accordingly, there are no

19  genuine issues of material fact regarding whether Defendant committed fraud

20  against Plaintiffs, and summary judgment is appropriate.

21

22      [2]Pursuant to Fed. R. Civ. P. 30(b)(6), Brett Estey was designated as a

23  representative to testify on behalf of Apollo Sheet Metal and Apollo, Inc. regarding

24  liability.  In his deposition, Mr. Estey was asked whether Apollo possessed any

25  facts or information that would lead it to believe or allege that at the time the

26  parties met and verbally agreed to a Teaming Agreement, as Plaintiffs allege, that,

27  in fact, Defendant never intended to actually submit a bid with Plaintiffs and he

28  answered that "there were no facts."  (Ct. Rec. 204, Ex. 12.)

**ORDER DENYING, IN PART, AND GRANTING, IN PART,**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 16**

E.    **Defendant's Motion for Summary Judgment Regarding Misappropriation of Trade Secrets**

Defendant asserts that there are no genuine issues of material fact regarding whether it misappropriated Plaintiffs' trade secrets.  Plaintiffs assert that Defendant misappropriated their trade secrets and used improper means to acquire knowledge of them, and the improper means would be fraudulently entering into the Teaming Agreement with Plaintiff.

Washington statute prohibits the misappropriation of trade secrets.  Wash. Rev. Code § 19.108 *et seq.*  In order to establish a claim of misappropriation of trade secrets, Plaintiffs first must demonstrate that a legally-protectable trade secret exists.  *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 49 (1987).  Washington statute defines both misappropriation and trade secret.  A "trade secret" means information that "derives independent economic value,  actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Wash. Rev. Code § 19.108.010(4).  "Misappropriation" is defined, in part, as acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.  Wash. Rev. Code § 19.108.010(2).

Defendant argues that Plaintiffs have asserted that only one of Defendant's bid documents contains Plaintiffs' asserted trade secrets and that Plaintiffs' claim for misappropriation of trade secrets fails because Plaintiffs made no reasonable effort to maintain the confidentiality and secrecy of such information.   According to Defendant, Mr. Suter, of the TET team, observed no material similarities in the

information and data contained in the two proposals to support Plaintiffs' claims.[3]

According to Plaintiffs, Defendant misappropriated from Plaintiffs the following trade secrets: (1) Plaintiffs' knowledge, information, technique, process of method for responding to the task order work RFPs for commercial fabrication services; and (2) the draft proposal prepared by the Apollo/Parsons team pursuant to the teaming agreement. According to Plaintiffs, Defendant did not know how to prepare a technical and management approach to a task order RFP in connection with Hanford work, and Plaintiffs' personnel shared their knowledge and forms of drafts of their approach with Defendant.

From the record, it appears that the task order work portion of the RFP was not considered in making the final awarding of the bid. Moreover, Plaintiffs did not provide the Court with any evidence that Defendant's final proposal was similar to the draft proposal prepared by the Apollo/Parsons team. From the Court's perspective, the evidence necessary to support this claim would be a copy of the draft proposal completed up to the time that Defendant terminated their participation in the joint project, and a comparison between the draft proposal and Defendant's final submission. Plaintiffs did not provide this comparison to the Court and without it, there is nothing in the record to support Plaintiffs' claim that Defendant misappropriated their trade secrets. Thus, regardless of Mr. Suter's testimony, there are no genuine issues of material fact regarding misappropriation of trade secrets, and the Court grants summary judgment with regard to Plaintiffs' claim for misappropriation of trade secrets.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Defendant's Motion for Summary Judgment Regarding Damages and Causation (Ct. Rec. 136) is **GRANTED in part, and DENIED in part**.

---

[3]As discussed above, Plaintiffs have established that a genuine issue of material fact exists regarding the credibility of Mr. Suter's statement.

1      2.    Defendant's Motion for Summary Judgment Regarding Breach of

2  Contract (Ct. Rec. 138) is **DENIED**.

3      3.    Defendant's Motion for Summary Judgment Regarding Tortious

4  Interference with Business Expectancies (Ct. Rec. 140) is **GRANTED**.

5      4.    Defendant's Motion for Summary Judgment Regarding Fraud (Ct. Rec.

6  142) is **GRANTED**.

7      5.    Defendant's Motion for Summary Judgment Regarding

8  Misappropriation of Trade Secrets (Ct. Rec. 144) is **GRANTED**.

9      6.    The pretrial conference set for June 9, 2005 is **stricken**.  The pending

10  pretrial motions will be decided at trial.

11      7.    The Agreed Motion to Shorten Time for Hearing of Apollo's Motion to

12  Modify Scheduling Order (Ct. Rec. 128) is **DENIED**, as moot.

13      8.    Plaintiffs' Motion to Strike Reply Memo (Ct. Rec. 234) is **DENIED**, as

14  moot.

15      9.    The parties' Stipulated Motion to Expedite Hearing (Ct. Rec. 236) is

16  **DENIED**, as moot.

17      **IT IS SO ORDERED.**  The District Court Executive is hereby directed to

18  enter this order and to furnish copies to counsel.

19      **DATED** this 15th day of June 2005.

20

21                s/ ROBERT H. WHALEY

22               United States District Judge

23

24

25  Q:\CIVIL\2003\Apollo\deny.ord.wpd

26

27

28

**ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ~ 19**